.(6 App. Div. 571)

MANHATTAN RY. CO. et al. v. O'SULLIVAN et al.

(Supreme Court, Appellate Division, First Department. June 5, 1896.)

1. CONDEMNATION PROCEEDINGS—APPEALABLE ORDERS—SETTING ASIDE AWARD.
Code Civ. Proc. § 3375, provides that in condemnation proceedings appeals may be taken from final orders; that such appeals bring up for review all proceedings subsequent to the judgment that condemnation was necessary, and also the original judgment and all antecedent proceedings, where appellant states in his notice of appeal that the same will be brought up for review, and a case therefor, or a case and exceptions, has been settled; and that the court, in its discretion, may direct a new appraisal, before the same or new commissioners, which shall be conclusive. *Held*, that such appeal is not exclusive, and that an appeal lies from an order setting aside the award of commissioners as excessive.

2. SAME—APPEAL—DUTY OF APPELLATE COURT.
In condemnation proceedings, where a motion is made in the special term to set aside an award as excessive, such court is not the original tribunal, whose discretionary action should not be disturbed; and, on appeal from an order granting such motion, the appellate court will confirm the award if it was right, and, if it was wrong, will affirm the order.

3. EMINENT DOMAIN—CONDEMNATION PROCEEDINGS—AWARD OF COMMISSIONERS —WHEN DISTURBED.
An award of commissioners of appraisal in condemnation proceedings will not be disturbed unless it appears that injustice has been done, that they overlooked some material feature of the case, proceeded on an erroneous principle, or were influenced by prejudice or passion.

4. SAME—DAMAGES CAUSED BY ELEVATED RAILROAD—WHEN EXCESSIVE.
In proceedings to assess damages to abutting property caused by construction of an elevated railroad in the street, it appeared that, since 1873, property in the locality had increased in value from 100 to 500 per cent., and that property within half a block of the property in question increased in value 100 per cent. The evidence of three experts was that, since 1873, the property in question had decreased in value more than 100 per cent., and of two experts that the value had not changed. *Held,* that it was error to set aside as excessive an award by commissioners of about one-third the decrease in value according to the estimate of the three experts.

5. SAME.
The evidence of the company's two experts showed a depreciation since 1873 in value of one piece of property of $5,000, while that of two or three others showed a decrease of $15,000. There was also evidence that

there would have been a material increase but for the existence of the road. *Held*, that it was error to set aside as excessive a commissioners' award of $10,000.

Appeal from special term, New York county.

Application by the Manhattan Railway Company and the Metropolitan Elevated Railway Company for the appointment of commissioners to assess damages to abutting property caused by the construction of an elevated railroad in a certain street. From an order setting aside the award of the commissioners as excessive, and appointing new commissioners, Eugene O'Sullivan, Vincent J. O'Sullivan, Percy B. O'Sullivan, and Ernest P. O'Sullivan appeal. Reversed.

Argued before BARRETT, RUMSEY, WILLIAMS, PATTERSON, and INGRAHAM, JJ.

William V. Rowe and Joseph H. Chaote, for appellants.
Julien T. Davies, Edward C. James, and William H. Godden, for respondents.

BARRETT, J. The point is taken that the order in question is not appealable for the reason that it is not a final order. The plaintiffs (the companies) contend that the provisions of section 3375 of the Code of Civil Procedure are exclusive, and that there can be no other appeal in these proceedings save that which is there specially authorized. We think this construction of the condemnation law is unauthorized. It was never intended to limit the ordinary review of special term orders in these proceedings. Such limitation cannot be implied merely from the direct authority to appeal from a final order. The provision in question is not that appeals can be taken only from such final orders. It is a provision that appeals may be taken from final orders, and when so taken shall have a special and particular effect. Thus, it is provided that such appeal will bring up for review all proceedings subsequent to the original judgment whereby it was decreed that the condemnation was necessary for the public use. It is also provided that such appeal will bring up for review the original judgment and all antecedent proceedings where the appellant states in his notice of appeal that the same will be brought up for review, and where a case therefor, or a case and exceptions, shall have been settled as in ordinary actions. This, however, is not all. It is further provided that, upon the appeal from the final order, the court, in its discretion, may direct a new appraisal, before the same or new commissioners, and that such new appraisal shall be final and conclusive upon all parties interested. These are the sequences following the particular appeal thus specially provided for.

It will be observed that these sequences exclusively follow the particular appeal. Upon no other hearing, in no other phase of the procedure, can a new appraisal be ordered which will be final and conclusive. The report of commissioners may be set aside at special term for irregularity, or for error of law, or upon the ground that the award is excessive or insufficient. But if the report be there

set aside, and a new appraisal ordered, such new appraisal is not final and conclusive. Such new appraisal has merely the same effect as the original appraisal,—neither more nor less,—and the proceedings for its confirmation are precisely the same as the proceedings for the confirmation of the first report. Section 3371. It is only when some report has been confirmed at special term that a final order can be entered upon appeal, from which the consequences of finality, either from affirmance or upon a new appraisal directed by the appellate division, must result. It is apparent, therefore, that there is nothing in the provision authorizing an appeal from the final order, with these attendant consequences, which suggests an intention to exclude the ordinary appellate jurisdiction of this branch of the supreme court in special proceedings. The proceeding is in the supreme court. The petition is required to be addressed to the supreme court. Section 3360. The general practice of the court is made applicable to these proceedings. Sections 3366–3368, 3382. They are now a part of the Code of Civil Procedure. The clear intention was to adapt the procedure in condemnation proceedings, as far as practicable, to the ordinary procedure in civil actions and special proceedings under the Code.

There is nothing in the condemnation law which revokes or modifies the rule that discretion is vested in the appellate branch of the court equally with the special term. Nor is there any provision which, directly or by necessary implication, takes away the fundamental and inherent power to review any such exercise of discretion of the special term. Under the law as it existed prior to this condemnation act, the court was, in the first instance, required to make a final order confirming the commissioners' report. Within 20 days thereafter either party might appeal. The appeal was to "the supreme court," and the direction was that such appeals should be heard by "the supreme court at any general or special term thereof." Laws 1850, c. 140, § 18. Under the present law the old practice was varied in form because of the manifest inconvenience of permitting an appellant to choose his tribunal in the first instance, and because the old practice on that head was exceptional. But the substance remained the same. The confirmation pro forma is not now permitted. Nor can the appellant choose, in the first instance, the branch of the tribunal which he prefers. But his appeal is still to the supreme court. Now he must proceed in the first instance at special term. He cannot, as formerly, go directly, if he pleases, to the appellate branch. But clearly it was only intended to prevent his going there in the first instance,—not to prevent his going there in the usual way, and in accordance with the established practice. The point does not seem to have been directly raised in any of the cases, probably because it was deemed untenable. We find, however, that the power of review has been frequently asserted, and has apparently never been questioned. It has been the common practice in this department to review all kinds of orders, as well as final orders, in these proceedings, and the books will be found to be full of such cases.

The precise point, although not specifically raised, was fully con-

sidered and decided in favor of the power to review in the Second department.    In Re Brooklyn El. R. Co., 80 Hun, 355, 30 N. Y. Supp. 133, the report of the commissioners was set aside at special term, and the general term held that the order was reviewable.    Brown, J., in delivering the opinion of the court, said:

"The intention of the legislature was that the award should be reviewed at special term and general term upon the facts as upon the law."

In Re Brooklyn El. R. Co., 87 Hun, 88, 33 N. Y. Supp. 881, the same court reversed an order of the special term setting aside the report of commissioners, and confirmed the report.    In Re New York & B. Bridge, 137 N. Y. 95, 32 N. E. 1055, there was an appeal to the court of appeals from an order of the general term in the Second department, reversing an order of the special term setting aside the report of commissioners, and confirming the report. 21 N. Y. Supp. 233.    The general term, in confirming the report, awarded interest from the date of the special term order.    The court of appeals held that the general term was limited to the reversal of the order of the special term, and the confirmation of the report, that the general term could not add the interest, and that the order should be modified by striking out the allowance of interest, and, as thus modified, affirmed.    The authority of the general term to review the order of the special term setting aside the report was distinctly affirmed.    "It is said," observed Earl, J., "that the general term may do what the special term ought to have done. That is quite true.    It may make the final order which the special term should have made."    Upon both principle and authority, therefore, we think this order is appealable to the appellate division.

There has been some confusion with regard to the appealability of special term orders, resulting from the occasional misapplication by the profession of language used by the court of appeals concerning the review by that court of general term orders.    Without a clear appreciation of the distinction between the appeal from special to general term, and the appeal from general term to the court of appeals, it would be easy, for instance, to misunderstand the language used by Earl, J., in Re Prospect Park & C. I. R. Co., 85 N. Y. 498, where he speaks of a section of the act of 1854 (chapter 282), amending the act of 1850 so as to conform the practice in such cases as nearly as possible to the ordinary practice in the court,— a provision which has been substantially embodied in the present condemnation law (Code, § 3383),—as intended to effectuate the object and purpose of the two acts, "not to thwart them by allowing more review and more appeals than the act provides for."

Even in the case of In re New York & B. Bridge, supra, the court of appeals reaffirmed the general rule that the confirmation by the appellate branch of the supreme court of awards in condemnation proceedings is not reviewable there.    The court held, however, that where the appellate branch of the supreme court exceeded its authority, by increasing or modifying an award, its action would be reviewed even in that court.    Thus the power of review where a substantial right has been invaded, although not specially conferred by the condemnation law, was asserted, and, in

the case then before the court, utilized. The exercise of this power was analogous to the exercise in the supreme court of the inherent power to vacate an order confirming the report of commissioners in a proper case, although no such power was specially conferred by the act,—an inherent power, the exercise of which was always reviewable by the general term, though not by the court of appeals. In re New York Cent. & H. R. R. Co., 64 N. Y. 60; In re New York, L. E. & W. R. Co., 93 N. Y. 385, affirming 29 Hun, 602.

It becomes our duty, therefore, to consider the case upon the merits. The duty of this court in the consideration of the appeal is not doubtful, though it seems to be misunderstood by the plaintiffs' counsel. An award has been made by the commissioners, and set aside as excessive by the special term. Our sole duty is to determine whether the latter action was proper. The court below was not in this case acting as the original tribunal, whose discretionary action, within broad limits, should not be disturbed. That position was occupied by the commissioners. If the special term should have confirmed the report, then we must confirm it. If it was right to set the report aside, then we must affirm the order. The case is to be treated substantially as though the special term had confirmed the report, and the plaintiffs were appealing. The rule which governs upon the review of the award of commissioners is well settled. Every intendment is in favor of the action of the commissioners. They are not confined to the evidence adduced before them, but may view the premises. The court not only lacks the opportunity of seeing the witnesses,—which always leads an appellate tribunal to differ reluctantly with the trial court,— but also is without this important aid which is open to the commissioners. The practice in cases of this character, as was said by Van Brunt, P. J., in Re New York El. R. Co. (Sup.) 12 N. Y. Supp. 858, has been not to disturb the findings of the commissioners unless it was apparent that injustice had been done, or that they had overlooked some material feature of the case, or proceeded upon an erroneous principle, or been influenced by prejudice or passion. In the case at bar, we find nothing to bring the action of the commissioners within any of these grounds for setting aside their award.

Two parcels of property were under appraisement. The first consisted of Nos. 148 to 152 Pearl street, on the southeast corner of Wall and Pearl streets, having a frontage of over 61 feet on Pearl street and over 47 feet on Wall street, and an average depth of about 60 feet. For this the commissioners awarded $65,000. Five experts testified as to its value,—three, Read, Golding, and Harnett, for the defendants, and two, Fish and Phillips, for the plaintiffs. Their estimates were as follows:—

|  | 1873. | 1877–78. | 1893–94. |
|---|---|---|---|
| Read | $350,000 | $280,000 | $160,000 |
| Golding |  | 275,000 | 165,000 |
| Harnett | 350,000 | 280,000 | 175,000 |
| Fish | 235,000 | 200,000 to 205,000 | 235,000 |
| Phillips | 225,000 | 180,000 | 225,000 |

Thus the evidence of the defendants' experts shows a depreciation of about $185,000 since 1873, and about $110,000 since 1877, just before the road was built, while that of the plaintiffs' experts indicates an increase over 1877 values of about from $35,000 to $45,000, and a practical equality with the values of 1873.

This property is a Wall street corner, and all the experts agreed that the value of such property had, in general, enormously increased in the last 20 years. The plaintiffs' experts were fully as emphatic upon this point as the defendants. Phillips says that such property has in some instances gone up as much as 500 per cent., and Fish says that none of the corners between Broadway and Pearl street has increased less than 100 per cent. Whether the westerly corners of Wall and Pearl streets were meant to be included is not entirely clear, but it seems not. It is, however, quite undisputed that each and every corner on each and every street west of Pearl street has increased at least 100 per cent, and some of them very much more. Now, upon the estimates of the plaintiffs' own experts, the property in suit has remained stationary since 1873. Each side had a theory to account for this,—the defendants that the road had prevented all advance by cutting off the property from the locality of increase, and the plaintiffs that the center of values is Broadway and Wall street, the radiation from which had not yet reached the defendants' property. We must confess that the latter theory does not seem fairly to account for the phenomena of the case. It may be conceded that the center of values is Broadway and Wall street, but the defendants' property was not sufficiently removed to be debarred from all participation in the increase. William street corners, a block away, have more than doubled in value; and Phillips says that the property on the easterly corner of Hanover and Wall streets, half a block nearer, has at least doubled. Not only that, but No. 65 Wall street, an inside property, is proven to have nearly, if not quite, doubled in value. It is certainly peculiar that the tide of increase should have rolled so near, and then stopped; and the defendants are justified in thinking that it is thrown back by the breakwater of the elevated road. The plaintiffs' witnesses express their opinion that "some day" this property will take its share of the general prosperity; but we are not disposed to differ with the commissioners in their evident belief that the movement in this direction has quite spent itself.

The subject of rents, about which a great deal has been said, can only be briefly considered here. There is evidence to show that a general ratio between rental and fee values exists, which was 9 to 10 per cent. prior to 1880, and has been 8 to 9 per cent. or 7 to 8 per cent. since. By computation upon this basis from rents received from the property in suit, the plaintiffs' counsel have fixed the fee value in 1893 at from 10 per cent. to 15 per cent. more than it was in 1872. This result is strenuously combated by the defendants, on account of the rate at which the principal tenant was paying,—a rate which Fish admitted to be high, and which the defendants' experts all said was excessive. The defendants' ex-

perts state that this ratio is but one of the many factors in determining the fee value, and by no means a controlling one. Harnett goes so far as to state that it is of but little consequence. Fish practically concurs with the defendants' witnesses, for he limits his statement as to ratio to the particular subject in hand, and admits that special circumstances may cause a wide departure from the normal proportion. There can be no doubt that rental returns depend to a very great extent upon the nature of the building rented, and it is practically conceded that low rental value does not at all imply low fee value. But, even if we abandon the defendants' figures, we still find no satisfactory excuse for the failure of this property to share in the very great increase of similar property.

The defendants' buildings were admitted to be old-style office buildings, though well kept up as such. It is said that such structures could not hope to compete with the more modern buildings. There was some dispute as to whether new buildings in the vicinity of old property decreased the rental value of the latter, but that it did not decrease the fee value was admitted. Thus, the contention that the depreciation, if any, was due not to the elevated road, but to the failure to properly keep up the buildings, fails. If the vicinity of modern buildings does not depreciate the value of property such as the defendants', any argument based on the condition of the buildings is without much force. It must be admitted that the plaintiffs are not liable for decreased rentals. They have, in fact, been held liable only for damage to the fee. When we come to the crucial question, whether there has been such damage, the plaintiffs' arguments are practically reduced to the bald assertion that the value is still there, "in the land," and only requires "similar modern improvement to bring out its greatest return." Some value is there, of course,—more, doubtless, than is now evidenced by the rental; but that the land possesses anything like the value which it would have possessed but for the plaintiffs' elevated road is negatived by the estimates of the plaintiffs' own witnesses.

Nothing would be gained by the detailed reference to the sales and values of other property in the neighborhood. The property directly south of that in suit would seem, however, to furnish the most accurate index of the effect of the road. The property adjoining on the south is 146 Pearl street, which shows a decline in value of $11,000 from 1866 to 1884, and of $11,000 more from 1884 to 1889. The Mead property, Nos. 138 and 144, recovered heavy damages against the road. Between the two Mead parcels is the Carter Hawley property, Nos. 140 and 142. Each of these two lots cost $60,000, and in 1876 buildings were erected upon them at an expense of $100,000, making the total investment $220,000. They sold, however, at the end of 1887 for only $149,750. Other property in the near vicinity is cited which has advanced in value, but the reasons are generally not far to seek. The Journal of Commerce Building, on Hanover Square and Hanover and Beaver streets, is not only on the western side of the street,—alleged to

be much the more valuable,—but has frontage on three streets, and is some little distance removed from the road. No. 110 Pearl street is a corner saloon near the Hanover Square station, a sort of property which rarely loses ground. Nos. 130 and 132 Pearl street show an advance from 1887 to 1892, but they were thoroughly renovated in the meantime. The Tabor property, Nos. 137 to 141 Pearl street, on the west side of the street, at the corner of Beaver street, sold in 1893 for $99,500. By figuring out the property in suit at the same rate per square foot, and making an addition for the extra value of corner property, it is attempted to show that the latter is now worth what the plaintiffs' experts estimated. The Tabor property, however, cost altogether the sum of $183,000 in 1866, and this serious decline is really an argument for the defendants. Finally, the Marine Bank property, directly across the way from the defendants, sold for $175,000 in 1885. Fish makes the property considerably smaller than the property in suit; Phillips, who sold it, of about the same area. It would seem, however, that Phillips must have known the area; and, in any event, the frontage of this piece seems to be about the same as that of the defendants' property. If the two properties may properly be compared, the present estimates of the defendants' experts receive material support; for it is a fair inference that this bank building was a structure much superior to that upon the defendants' land. This inquiry need not be pursued farther. It would seem, however, that, according to the most reliable tests obtainable from neighboring property, defendants' premises have substantially decreased in value, and have also failed to share in the increase of similar property.

Nothing would be gained by further discussion. What we deem the controlling circumstance as to this parcel is an almost unparalleled rise in the value of similar property,—an increase which this parcel has not shared, and the failure to share which receives no satisfactory explanation, except the theory that it has been prevented by the plaintiff's road. We think that the commissioners would have been justified in awarding to this parcel alone the total award made for both parcels, and we shall consequently say but a few words regarding the remaining parcel. No. 92 Pearl street is on the east side, its northern boundary being 139 feet from the southerly line of Old Slip. It is 21 feet in front by about 63 in depth. Its value was estimated as follows:

|  | 1873. | 1877–78. | 1893–94. |
| --- | --- | --- | --- |
| Read | $35,000 | $23,000 | $20,000 |
| Golding |  | 35,000 | 20,000 |
| Harnett | 35,000 | 27,000 | 20,000 |
| Fish | 30,000 | 23,000 | 25,000 |
| Phillips | 25,000 | 18,000 | 20,000 |

Even upon the testimony of the plaintiffs' experts, there has been a decrease of $5,000 in value since 1873,—a fairer period with which to compare present values than 1877, which was a time of panic and great depression. Four out of five of the experts, also, estimate the present value of the property as only $20,000. There was

nothing to prevent the commissioners from accepting as true the estimate of 1873 values given by the defendants' witnesses, who preponderated in number, and certainly were not lacking in weight or credibility. If they had done so, their award of $10,000 would have been for actual decrease, which they were justified in finding to exist. But the testimony also shows that the property would have enjoyed a material increase but for the presence of the road.

Upon the whole, testing the action of the commissioners in the light of the controlling facts and circumstances, we do not find that their award is tainted with any error or abuse which would justify us in setting it aside. On the contrary, we think it is in all respects well grounded, just, and satisfactory. The decision of the learned judge at special term finds no support in the record, nor was there anything in the case he cites (Railway Co. v. Klipstein [Sup.] 33 N. Y. Supp. 1130) which required him to set aside the report of the commissioners. We apprehend that the decision resulted from an inaccurate view of this case, and of its binding effect, rather than upon the learned judge's individual opinion upon the evidence before him.

We may add, in conclusion, that the property on the corner of Wall street did not, under the Keene Case, 79 Hun, 451, 29 N. Y. Supp. 971, require to have the damage to the Wall street side separated from the other. The buildings were not distinct within themselves, as in the Keene Case, but, on the contrary, were rentable as a whole. It was consequently proper to assess the damages caused to the property as a unit. Bischoff Case, 138 N. Y. 257, 33 N. E. 1073.

None of the other exceptions require discussion.

The order appealed from should be reversed, and the report of the commissioners confirmed, with costs. All concur.